**Holmes, Taylor, Cowan,**
**Mermelstein & Jones LLP**
Andrew S. Cowan (SBN: 165435)
acowan@holmestaylor.com
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017
Tel:  (213) 985-2200
Fax: (213) 973-6282

Attorneys for Defendant Tony Ye

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                 Plaintiff,<br><br>      v.<br><br>TONY YE,<br><br>          Defendant. | Case No. 19-CR-0111-2-LHK<br><br>**SENTENCING BRIEF OF DEFENDANT TONY YE; DECLARATION OF JINJUAN ZHU; EXHIBITS 1-4**<br><br><br>Judge: Hon. Lucy H. Koh<br>Courtroom: 8<br>Sentencing Date:  11/17/21<br>Sentencing Time: 9:15 AM |

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

# **TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION ...................................................................... 1

II.  PERSONAL HISTORY AND CHARACTERISTICS ...................................... 3

    A.  Mr. Ye is Committed to his Family, a Hard Worker and an Immigrant Success Story. ...................................................... 3

    B.  Mr. Ye is an Essential Caregiver for his Elderly Parents, Who Both Live with Him. ..................................................... 5

III.  FACTS OF THE CASE .............................................................. 6

    A.  All Investor Funds Managed by Mr. Ye were Spent on Actual Development Projects that Created Numerous American Jobs. ............. 6

    B.  Mr. Ye's Criminal Conduct ................................................ 8

IV.  THE COURT SHOULD SENTENCE MR. YE TO A TERM OF HOME CONFINEMENT .............................................................. 10

    A.  Sentencing Guidelines Calculations .................................... 10

    B.  The Court Should Grant a Downward Departure or Variance Based on Mr. Ye's Exceptional Family Responsibilities. .................. 11

    C.  A Term of Home Confinement Should be Imposed. ........................ 14

V.  THE COURT SHOULD NOT PERMIT NON-VICTIMS TO SPEAK AT THE SENTENCING HEARING, NOR BE INFLUENCED BY THEIR WRITTEN STATEMENTS. ............................. 16

VI.  OBJECTIONS TO PRESENTENCE REPORT ........................................ 19

VII.  CONCLUSION ..................................................................... 19

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## CASES

*In re Rendon Galvis,* 564 F.3d 170 (2d Cir. 2009) ...................................................... 16

*United States v. Daly*, 2012 WL 315409 (D.Conn. 2012) ........................................ 17

*United States v. Dominguez*, 296 F.3d 192 (3d Cir. 2002) ....................................... 12

*United States v. Guerrero,* 2021 WL 2550154 (N.D.Ill. June 22, 2021) ................. 17

*United States v. Leon*, 341 F.3d 928 (9th Cir. 2003) ................................................. 12

*United States v. McMahon*, 2011 WL 13208839 (C.D.Cal. 2011) ........................... 17

*United States v. Menyweather*, 447 F.3d 625 (9th Cir. 2006) .................................. 12

*United States v. Sharp,* 463 F.Supp.2d at 556
 (E.D.VA 2006) ........................................................................................................ 16, 17

*United States v. Thuna*, 382 F. Supp. 3d 166 (D.P.R. 2019) ..................................... 17

## STATUTES

18 U.S.C. § 1344(2) ........................................................................................................ 6

18 U.S.C. § 1512(b)(3) ........................................................................................... 2, 6, 17

18 U.S.C. § 1546(a) ......................................................................................................... 1

18 U.S.C. § 3553 ...................................................................................................... 14, 15

18 U.S.C. § 371 ....................................................................................................... 2, 6, 17

18 U.S.C. § 3771 ........................................................................................................ 2, 16

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK

## <u>EXHIBITS</u>

**Exhibit 1:** Allocution Letter of Tony Ye

**Exhibit 2:** Letter from Ariel Lu

**Exhibit 3:** Letter from Amy Wu

**Exhibit 4:** Letter from Chad Converse

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

<div align="center"><b><u>SENTENCING BRIEF</u></b></div>

Tony Ye is a 53-year old real estate developer who has never before been in trouble with the law. He came to the United States from his native China as a graduate student in 1992 and became a U.S. citizen in 2007. His professional career thrived here, first in environmental science and later as a developer. He is grateful for the opportunities he has been given in this country and proud of what he had accomplished as an immigrant. For these reasons, pleading guilty to the charges in this case was emotionally difficult for him. But he has accepted responsibility for his misconduct. As he tells the Court in his allocution letter, "Wrong is wrong, nothing can remove my wrongful conduct."

## I. **INTRODUCTION**

This case arose from a lengthy investigation by the Securities and Exchange Commission into the activities of an immigration law firm established and run by Mr. Ye's former wife, Danhong "Jean" Chen. The SEC filed its complaint on October 18, 2018. The following day, Jean Chen fled the United States and has been a fugitive ever since. When Mr. Ye learned about the SEC complaint, he was in China attending to a medical emergency for his mother, who had been visiting relatives there. He returned to the United States later that month to face the SEC case, as well as the criminal case brought against him and his ex-wife a month later, in November 2018.

The core of the original 14-count indictment centered on ten counts of alleged visa fraud, in violation of 18 U.S.C. § 1546(a). The government had alleged that Jean Chen and Mr. Ye knowingly presented to the United States Citizenship and Immigration Services (USCIS) numerous false statements in applications for foreign investor visas, commonly known as EB-5 visas. But none of these applications were presented to immigration authorities by Mr. Ye—who is not an attorney and who was not responsible for preparing, signing or submitting these applications. This had been done exclusively by his fugitive ex-wife with other attorneys at her law firm. In light

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

1    of these facts, Mr. Ye ultimately pleaded guilty instead to a two-count Superseding

2    Information that did not charge him with visa fraud.

3      Mr. Ye has pleaded guilty to the two crimes charged in the Superseding

4    Information: conspiring to obstruct the lawful functions of the USCIS, in violation of

5    18 U.S.C. § 371, and obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3).

6    The Sentencing Guidelines place him a range where he is eligible for home

7    confinement, and this is an appropriate sentence for Mr. Ye, a first-time offender who

8    will not break the law again. As discussed in detail below, lenience is warranted. This

9    is not a typical EB-5 case involving fraudulent economic projects or phantom job

10    creation. The investor money instead financed real construction projects that created

11    jobs sufficient to satisfy the EB-5 program requirements. Moreover, the central player

12    responsible for submitting materially false EB-5 applications to the government was

13    Mr. Ye's fugitive ex-wife—the immigration attorney who, together with other attorneys

14    at her firm, prepared, signed and filed the EB-5 visa applications. Finally, the Court

15    should be lenient because Mr. Ye is the sole caretaker for his elderly parents, who live

16    with him and have significant medical issues that require his constant attention and

17    assistance.

18      For the reasons set forth below, the Court should sentence Mr. Ye to a six-month

19    term of home confinement, coupled with 80 hours of community service.[1]

20

21    _____

22    [1]    After the Probation Officer disclosed the PSR, the defense learned from government counsel that an attorney, Julie Bonnel-Rogers, had submitted numerous

23    statements from clients she contends were victims, and planned to speak at the sentencing hearing on behalf of her clients, at least one of whom wanted to speak at the

24    hearing as well. As discussed below in Section V, none of the Bonnel-Rogers clients are "crime victims" within the meaning of the Crime Victims' Rights Act, 18 U.S.C.

25    § 3771 ("CVRA"), because they were not directly or proximately harmed by the

26    criminal conduct Mr. Ye was charged with and to which he pleaded guilty. As such,

27    neither they nor their attorney has any right under the CVRA to address the Court at sentencing.

28

**SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

## II.     PERSONAL HISTORY AND CHARACTERISTICS

### A.     Mr. Ye is Committed to his Family, a Hard Worker and an Immigrant Success Story.

Mr. Ye was born in China and came to the United States as a young man in 1992, after obtaining a scholarship for a PhD program at the University of California at Riverside.  PSR ¶¶ 62, 64, 74.  He had very little money and could only afford to pursue his studies by working as a teaching and research assistant while he studied.  Allocution Letter of Tony Ye, attached hereto as Exh. 1.  He then transferred to UC Berkeley and in 1995 earned a master's degree in statistics.  For over a decade he worked in the field of environmental risk assessment, which led to an interest in developing real estate.  Since 2012, he has worked principally as a real estate developer, assisting clients with construction permits and navigating the permit approval process.  PSR ¶ 76.

Mr. Ye is devoted to his family.  He guided his sole daughter, Evelyn, through critical teenage years by himself after her mother, his ex-wife, fled the country in 2018.  He is proud that she was accepted into UC Berkeley, but worries that she has trouble fitting in.  He spends a good deal of his time taking care of his elderly parents, as discussed below in Section II.B.  And over the past few years has begun to build a new life for himself with his finance, Ariel Lu, and her ten-year old son, whom he adores and parents. Mr. Ye looks forward to their wedding day, but will not exchange vows until after this case has concluded and he has paid his debt to society.  As he writes in his allocution letter, "Ariel and I are engaged, friends asked whether we have a wedding date, we don't yet. I want to marry her as a clean person, give her the best of me. I will finish my sentence, then marry her."  Letter of Tony Ye, attached hereto as Exh. 1, at 4.

Ariel Lu loves Mr. Ye as "a hardworking and very honest man who works late in his office, a good son who take care of his parents, a caring father who would spend

hours waiting at the train station to pick up his daughter." Letter of Ariel Lu, attached hereto as Exh. 2, at 1. She has seen him parent her 10-year old son, and teach him how to treat people of other races and backgrounds with respect. *Id.* She would like to marry him now, but respects his decision to put off the wedding until he has put this criminal case behind him. *Id.* at 2.

Mr. Ye's friend and business associate, Xizhen Wu, describes Mr. Ye as "an enthusiastic man ready to help others." Letter of Xizhen Wu, attached hereto as Exh. 3. Chad Converse, who worked with Mr. Ye in his development business, describes him as a mentor who helped "guide me to realize my potential." He considers Mr. Ye "a leader in the Chinese-American community and a strong voice for immigrant rights." Chad Converse Letter, attached hereto as Exh. 4.

Mr. Ye profoundly regrets breaking the law, and is ready to accept whatever punishment the Court imposes. As he wrote to the Court:

> From angry and self-pity, I reflected of my life and guilt. I came to this country with American dream, I received financial support from UC to allow me to finish my education. I always wanted to repay my community through hard working, kind heart and warm smiles. Ending up in this court, and causing court to spend time on me is shameful and is the last thing I ever wanted. It is too late for me to say my ex-wife and I should have been transparent about our role in GSRC. But it is not too late to for me to say that I will never do something like this ever again.
>
> My action caused worries and tears among the people who love me. I failed them. I am so sorry. With all remorse and regrets, I am ready to face the consequence of the judgement. I would like to send my appreciation to the court, to pre-trial officers. I was treated with respect and dignity. I made many mistakes, major ones in my life. But I continue trusting American legal system, and continue believing in American dream.

Exh. 1 at 4.

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

**B.    Mr. Ye is an Essential Caregiver for his Elderly Parents, Who Both Live with Him.**

Mr. Ye is the sole caregiver for his elderly parents, who live in a small bedroom on the first floor of his house.  PSR ¶ 69.  His father and mother both suffer from a range of age-related conditions, and require Mr. Ye's assistance for meals, transportation, doctor visits, and a host of other necessities.  Because neither of Mr. Ye's parents speak English, they are especially dependent on him to communicate with medical professionals on their behalf.

Mr. Ye's mother, Jin Juan Zhu, is 84 years old.



**SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

Both of Mr. Ye's parents are frail and in need of the 24/7 care that he provides. In her declaration, his mother provides a summary of the medical-related care that Mr. Ye provided to them during a typical three-month period (July-September 2021). ███

███████ ███████████████████████

█████████████████████████

███████████████████████

████████████████

Were Mr. Ye to serve time in prison, this would be devastating for his parents. His family cannot afford 24-hour in-home care for the two of them, and he has no other immediate family in the Bay Area apart from his college-age daughter. Zhu Decl. ¶ 9.

████████████████████████████

████████████████████████████

█████████████████████████████

██████████████████████████████

█████████████████████████████

█████

## III. FACTS OF THE CASE

On May 26, 2021, Mr. Ye pleaded guilty to one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3). The facts below supplement those set forth in the PSR.

### A. All Investor Funds Managed by Mr. Ye were Spent on Actual Development Projects that Created Numerous American Jobs.

The United States administers the Employment-Based Immigration Fifth Preference program, known as the "EB-5" program. This program encourages job creation in the United States by allowing foreign nationals to obtain permanent U.S. residency if they invest in qualifying U.S. businesses. A foreign national is eligible for

SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

1  an EB-5 visa if he or she invests at least $500,000 in a qualifying business located in a

2  designated "target employment area," provided that certain criteria are met.  One

3  important criteria is that the qualifying business creates or preserves full-time positions

4  for at least ten qualifying employees withing two years.  These investments may be

5  made to qualifying Regional Centers, which are entities that develop various

6  commercial projects. PSR ¶¶ 7-10.

7      Beginning in late 2014, Mr. Ye's former wife, fugitive attorney Jean Chen,

8  prepared and submitted numerous EB-5 visa applications on behalf of foreign investors.

9  These applications were prepared and submitted by attorney Chen and the lawyers who

10  worked for her at the Law Offices of Jean Chen ("Chen Law Firm").  The applications

11  were lengthy and consisted of two principal parts:  one which provided substantial

12  detail on the applicant's background and finances, and one which provided detail on the

13  business entity that would receive the investment funds.  Mr. Ye, who is not an

14  attorney, did not prepare these applications or the underlying documents, did not sign

15  them, and did not submit them to the United States.

16      Mr. Ye encouraged foreign investors to place their money in projects being

17  developed by the Golden State Regional Center ("GSRC").  During the relevant time

18  period, GSRC placed these investor funds in two principal projects, which were mixed-

19  use real estate developments in Northern California.  The first was the Sabercat project,

20  located in Fremont Hills.  The second was the Kawana Meadows project, located in

21  Santa Rosa.  Through investment funds it controlled, GSRC placed $40 million of EB-5

22  investor funds into Sabercat, and $12.5 million into Kawana Meadows.

23      These developments were construction projects that broke ground and which

24  created and sustained numerous jobs, thereby satisfying the job-creation requirement of

25  the EB-5 program.  Both received significant funding from non-foreign investors as

26  well.  Because the EB-5 applications submitted by the Chen Law Offices involved real

27  investors, real projects, and real job creation, this case is different from many other

28

**SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

EB-5 cases, which often involve phantom investors or nonexistent or fraudulent projects. For example, in 2019 this Court presided over the trial in *United States v. Jennifer Yang & Daniel Wu*, CR-16-334-LHK. In that case, the defendants were charged with defrauding investors and deceiving the government by fabricating records of purported employees, to give the illusion that jobs existed when in fact they did not. No such deception exists in the instant case. Although Mr. Ye broke the law, as discussed below, he at all times ensured that every dollar of investor funds was spent on the designated development projects.

### B.    Mr. Ye's Criminal Conduct

As set forth in the plea agreement, Mr. Ye broke the law by acting contrary to certain representations made in the EB-5 applications prepared and submitted by the Chen Law Firm. These applications included subscription documents for the Sabercat and Kawana Meadows projects which represented that a person named Kai Robinson was the manager of GSRC and that she fully controlled the entity and its operations. Kai Robinson, however, did not fully control GSRC because attorney Chen and Mr. Ye were the sole signatories on the GSRC bank accounts and for the qualified investment accounts controlled by GSRC. The USCIS was therefore led to believe that GSRC was completely independent from the law firm that prepared and submitted the EB-5 applications related to GSRC projects, when in fact it was not. In this way, Mr. Ye conspired with his former wife to obstruct the lawful functions of the UCSIS.

As explained in his allocution letter, Mr. Ye's ex-wife was very successful as an immigration attorney, and received a lot of flattering attention from the Chinese-American community. Mr. Ye wanted to be a part of that as well, and also wanted to be successful as a developer. Letter of Tony Ye, Exh. 1 at 2. So he involved himself in the finances of GSRC, making himself a signatory on its bank accounts so that he could manage how the money got spent. Mr. Ye did not take any of the investor money placed into the GSRC bank accounts for his personal benefit, but he did control the

**SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

1  funds.  He did this even though he knew that the EB-5 applications Jean Chen sent to

2  USCIS indicated that GSRC was independent from the Chen Law Firm.  *Id.*  Later,

3  once the SEC investigation began, Mr. Ye tried to cover up what he and his wife had

4  done.  To that end, he obstructed the investigation by deleting emails in the possession

5  of Bethany Liou, a developer who owned the Golden California Regional Center

6  (GCRC), to which Jean Chen had referred EB-5 investors.  In early 2018, Jean Chen

7  asked Liou to delete certain emails between Liou and the Chen Law Firm.  Chen then

8  asked Liou to come to the Law Firm one evening and asked for access to Liou's email

9  account so that the emails could be deleted.  Liou willingly provided her password to

10  Mr. Ye, who then deleted emails in Bethany Liou's presence.  PSR ¶ 28.  Mr. Ye

11  knows that his conduct was indefensible, and he never should have participated in the

12  destruction of evidence.  He acted out of a misguided desire to cover up what he and his

13  wife had done, and to interfere with the SEC's investigation.  Tony Ye Letter, Exh. 1

14  at 2.  As he writes in his allocution letter:

15       During the time I managed the GSRC accounts, I did not take or
16       use any of the money in them for my personal use, all of the money
     was spent on the development projects.   I was very careful to make
17       sure all of the money got spent on the projects.  Somehow I hoped
     in my heart, that as long as all funds are used to create jobs (I
18       convinced myself it was a bigger good), that the dishonesty with
     non-disclosure could be forgiven. Now looking back, I was foolish.
19       Wrong is wrong, nothing can remove my wrongful conduct. And I
     will have to face the consequence. I was hoping to protect Law
20       office of Jean Chen, to protect our reputation, to protect my
21       daughter. But what I did is to the contrary.

22

23  *Id.* at 3.

24       Mr. Ye broke the law, but his conduct differs from what the Court sees in typical

25  EB-5 cases.  He did not submit to USCIS any of the misleading visa applications, nor

26  did he personally make any false statements to USCIS.  His ex-wife, an immigration

27

28

             **SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

attorney, did that.  Nor did he use for his own personal benefit any of the investment money placed into the GSRC bank accounts he controlled.[2]

## IV. THE COURT SHOULD SENTENCE MR. YE TO A TERM OF HOME CONFINEMENT.

### A. Sentencing Guidelines Calculations

In the plea agreement, Mr. Ye and the government agreed to certain Sentencing Guidelines factors.  The Probation Officer, Mr. Ye and the government all believe that the two counts of conviction should group. Mr. Ye conspired to obstruct a lawful function of the U.S. Government by deceitful or dishonest means, and then committed obstruction of justice with respect to that crime by destroying documents.  As the Probation Officer found, Application Note 8 to U.S.S.G. § 3C1.1 directs that a 2-level upward adjustment applies when obstruction of justice is grouped with the underlying count.[3]  PSR ¶¶ 35, 40.

Mr. Ye concurs with the Guidelines calculations set forth by the Probation Officer in ¶¶ 37-42, which are consistent with what he agreed to in the plea agreement under a grouping analysis.  The calculations are as follows:

---

[2] By contrast, Bethany Liou mishandled investor funds held at her own regional center and used them for her own purposes.  In November 2019, the SEC imposed a cease-and-desist order on her, under which she and GCRC were required to pay the SEC over $49 million.  PSR ¶ 30.

[3] The plea agreement does not calculate the offense level under a grouping analysis because at the time it was signed the government was not convinced that grouping applied.  The parties therefore agreed to set forth the relevant calculations under both counts of conviction and defer the grouping analysis to the time of sentencing.  See plea agreement at ¶ 7, PSR ¶ 4.

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## Count 1: Conspiracy

| | | | |
|---|---|---|---|
| Base Offense Level: | | 11 | U.S.S.G § 2L2.1(a), § 2X1.1 |
| Specific Offense Characteristics: | | | |
|    Between 6-24 documents: | | + 3 | U.S.S.G § 2L2.1(b)(2)(A) |
| | | | U.S.S.G. § 3E1.1 |
| Obstruction of Justice: | | + 2 | U.S.S.G. § 3C1.1 |
| Acceptance of Responsibility: | | - 3 | U.S.S.G. § 3E1.1 |
| **ADJUSTED OFFENSE LEVEL:** | | **13** | |

Mr. Ye is a first-time offender who has never before been arrested or charged with any crime.  He is therefore in Criminal History Category I.  PSR ¶¶ 56-57.  For Criminal History Category I, an adjusted offense level of 13 corresponds to a sentencing range of 12-18 months in Zone C of the Sentencing Table.  Under the Sentencing Guidelines, the Court may order that up to half of this time may be served through home detention.  U.S.S.G. § 5C1.1(d); PSR ¶ 83.  At the low end of this range, this would correspond to a split sentence of six months home confinement and six months imprisonment.

### B.    The Court Should Grant a Downward Departure or Variance Based on Mr. Ye's Exceptional Family Responsibilities.

The Probation Officer has recommended a downward variance based on Mr. Ye's essential role in caring for his infirm and elderly parents, but still recommends a three-month prison term.  The defense asks the Court to go further by applying a three-level downward departure or variance and sentencing Mr. Ye to a six-month term of home confinement, coupled with a requirement that he perform 80 hours of community service—twice that recommended by the Probation Officer.

The policy statement set forth in U.S.S.G. § 5H1.6 recognizes that a downward departure may be warranted where exceptional family caretaking responsibilities exist.  Mr. Ye's caretaking responsibilities for his two elderly parents satisfy the criteria set

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

forth in this section and provide a compelling basis for a downward departure, or alternatively provide the grounds for a downward variance. Courts have recognized that the need to care for elderly family members can serve as the basis for a downward departure. *See United States v. Dominguez*, 296 F.3d 192, 194, 199 (3d Cir. 2002) (4-level departure appropriate where defendant was sole caretaker of elderly parents, whose father was physically and mentally impaired and whose mother had severe arthritis and heart problems); *United States v. Leon*, 341 F.3d 928, 932 (9th Cir. 2003) (downward departure appropriate where defendant is an irreplaceable caretaker of elderly family members); *accord United States v. Menyweather*, 447 F.3d 625, 632-33 (9th Cir. 2006).

Section 5H1.6 directs the Court to undertake a two-part analysis: (1) consider three general circumstances related to the underlying crime; then (2) consider four specific circumstances related to family caretaking responsibilities. Under the first part of the analysis, the Court should consider: (i) the seriousness of the offense; (ii) the involvement in the offense, if any, of members of the defendant's family; and (iii) the danger, if any, to members of the defendant's family as a result of the offense. On balance, these factors weigh in favor of leniency. **First,** although the underlying offenses were federal felonies and by definition serious, Mr. Ye's conduct did not cause the full panoply of harm typically seen in EB-5 cases. As previously discussed, the projects sponsored by GSRC were actual construction projects that broke ground; jobs were actually created, and all of the foreign investor funds placed in GSRC bank accounts were expended on the projects. **Second,** Mr. Ye's parents were not involved in the offense, nor were any members of his immediate family.[4] The third factor,

---

[4] Although Mr. Ye's former wife Jean Chen had a prominent role in the criminal conduct, she is no longer a part of the family unit and has no responsibilities toward her former in-laws, Mr. Ye's parents.

SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

danger to Mr. Ye's family, is not a relevant factor in this case, which did not involve violence or threats of violence.

Under the second part of the analysis, § 5H1.6 directs the Court to evaluate whether the following factors exist:

**(i) Whether the defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.** This factor clearly exists. On a daily basis, Mr. Ye is intimately involved with the medical care of his two elderly parents, and also ensures that they have everything they need to live comfortable and dignified lives. Were he to serve a sentence of imprisonment, this would immediately disrupt the essential caretaking that he provides.

**(ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.** This factor also exists. The families of most defendants facing incarceration face harm from the loss of caretaking or financial support. But very few families face the challenges of Mr. Ye's family: two elderly parents ██████████████████, who speak no English and who live with their son as their sole provider and caretaker. The harm to them that would result from even briefly incarcerating Mr. Ye would far exceed the harm experienced by most families who face the loss of caretakers.

**(iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.** This factor also exists. Should Mr. Ye's parents be deprived of his caretaking, no decent alternative exists. ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

████████ Mr. Ye presently has no steady income, and cannot afford to pay for 24-

**SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

hour in-home care for his parents. His fiancée, Ariel Lu, has a full-time job and a 10-year old son, and cannot adequately care for his parents. Letter of Ariel Lu, Exh. 2 at 2. Mr. Ye's presence as a caretaker is truly essential.

**(iv) The departure effectively will address the loss of caretaking or financial support.** This factor also exists. A modest departure of two levels would reduce Mr. Ye's offense level from 13 to 11, placing him in Zone B of the sentencing table, where a term of home confinement is authorized without any requirement of imprisonment. As discussed below, the defense urges a downward departure or variance of three levels, which under the advisory Guidelines would permit a sentence of six month's home confinement.

### C.   A Term of Home Confinement Should be Imposed.

The Court should apply a 3-level downward departure or variance, and sentence Mr. Ye to a six-month term of home confinement, with a condition that he perform 80 hours of community service, double that recommended by the Probation Officer.

A strict application of the Sentencing Guidelines in this case would result in a prison sentence of at least six months, which is not needed to punish or deter Mr. Ye, would needlessly expose him to contracting COVID-19 and serious complications, and would deprive his elderly parents of the essential care that Mr. Ye provides to them on a constant basis. If the Court instead applies the 3-level downward departure or variance urged above in Section IV.B, this would result in a sentencing range of 6-12 months in Zone B. In this scenario, the Court may order Mr. Ye to serve a sentence of probation that includes home confinement as a condition. U.S.S.G. § 5C1.1(c)(3).

The proper sentence for Mr. Ye is home confinement, not imprisonment. With reference to the sentencing factors set forth in 18 U.S.C. § 3553(a), multiple factors weigh in favor of home confinement:

**SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK**

**First,** Mr. Ye is a first-time non-violent offender who will not violate the law again. Despite the significant personal toll that this case has taken on him, he remains determined to rebuild his life and provide for his family in the future. He has abided by all conditions of his pretrial release bond, and is therefore an excellent candidate for home confinement. He is in his mid-50s, and presents a very low risk of recidivism due to his age and the fact that his life had previously been law-abiding. The history and characteristics of Mr. Ye thus weigh strongly in favor leniency and a sentence of home confinement. *See* 18 U.S.C. § 3553(a)(1).

**Second,** as previously discussed, a sentence of home confinement will permit Mr. Ye to continue caring for his elderly parents. Should he be sent to prison, there are no good options that would provide his parents with a level of care equivalent to what he presently provides.

**Third,** the Court should strongly favor home confinement over imprisonment due to the continuing COVID epidemic. As the Court well knows, the close quarters in prison make social distancing impossible, turning the facilities into COVID incubators. Although Mr. Ye has been vaccinated, the highly contagious nature of the Delta variant means that he could still contract COVID. Mr. Ye is in his mid-fifties and therefore at a more elevated risk of developing a severe case were he infected.

**Fourth,** home confinement will provide adequate punishment and deterrence. *See* 18 U.S.C. § 3553(a)(2). It is not necessary to send Mr. Ye to prison, because he has amply learned his lesson and will not break the law again. Moreover, even after his criminal case is resolved, Mr. Ye must still face the pending civil case against him brought by the SEC, which may well have significant financial repercussions for him.

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

## V.   THE COURT SHOULD NOT PERMIT NON-VICTIMS TO SPEAK AT THE SENTENCING HEARING, NOR BE INFLUENCED BY THEIR WRITTEN STATEMENTS.

On Friday, November 5, 2021, the defense learned from the government than an attorney previously uninvolved in this case, Julie Bonnel-Rogers, had submitted more than 80 pages of documents to the United States Attorney's Office that she characterized as "victim impact statements."  Over the days that followed, she has continued to submit additional statements.  These submissions, made days after the Probation Officer had submitted her final PSR, consist principally of identical 5-page form statements that, judging from their captions, were prepared for "United States Bankruptcy Court" and differ from each other only in the name and signature of the declarant.  The government subsequently sent this heap of documents to the Probation Office and they are now with the Court.  These statements, signed by approximately 25 individuals who describe themselves as foreign EB-5 investors, allege a wide range of grievances against defendant Tony Ye, including that that he defrauded them and "took the BAIFI's $40 million and loaned it to himself."  (None of the Bonnel-Rogers clients are referenced in the Superseding Information or the Plea Agreement.)

The Crime Victims' Rights Act, 18 U.S.C. § 3771 ("CVRA") establishes that a "crime victim" has the "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding."  18 U.S.C. § 3771(a)(4).  The statute defines a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e)(2)(A).  Interpreting this definition, courts have held that an individual qualifies as a "crime victim" under the CVRA only if that person is "directly and proximately harmed by the federal crime *committed by defendant." See In re Rendon Galvis,* 564 F.3d 170, 175 (2d Cir. 2009), *quoting United States v. Sharp,* 463 F.Supp.2d at 556, 566 (E.D.VA 2006) (emphasis added).  The CVRA right to be heard

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

at sentencing does not extend to one who "asserts rights as a victim of an unrelated, uncharged, unproven Federal offense allegedly committed by the defendant." *United States v. McMahon*, 2011 WL 13208839, *1 (C.D.Cal. 2011). "A person will not qualify as a 'crime victim' merely because he suffers harm at the hands of the defendant, even if such harm qualifies as a separate crime." *United States v. Thuna*, 382 F. Supp. 3d 166, 170 (D.P.R. 2019).

In this case, Mr. Ye was charged with and pleaded guilty to two crimes that victimized no specific individuals. The victim of the first crime, conspiracy to defraud the United States in violation of 18 U.S.C. § 371, was the USCIS, which appropriately exercised its right under the CVRA to submit a victim statement. PSR ¶ 31. The second crime of conviction, obstruction of justice in violation of 18 U.S.C. § 1512(b)(3), similarly had no individual victims. Mr. Ye was not charged with, and did not plead guilty to, the alleged crimes alluded to in the statements orchestrated by attorney Bonnel-Rogers, which allude variously to visa fraud, wire fraud, mail fraud, bankruptcy fraud and perhaps other crimes as well. Neither attorney Bonnel-Rogers or her clients demonstrate how these unsubstantiated harms flowed "directly and proximately" from Mr. Ye conspiring to obstruct the lawful functions of the USCIS (Count 1) or obstructing justice (Count 2). *See* 18 U.S.C. § 3771(e)(2)(A); *United States v. Guerrero,* 2021 WL 2550154, at *13 (N.D.Ill. June 22, 2021) (claimant not victim because defendant's "crime specifically defrauded the Government, and not individuals"); *United States v. Sharp,* 463 F.Supp. at 566 (finding victim's harm to be "too attenuated" from the crime of conviction to satisfy the CVRA); *United States v. Daly*, 2012 WL 315409, *6 (D.Conn. 2012) (individuals not crime victims under CVRA when they alleged defendant committed crimes different from than that charged, and where no nexus existed between charged conduct and uncharged allegations). The Bonnel-Rogers clients are therefore not "crime victims" within the meaning of the CVRA, and neither they nor she has any right under that statute to participate in the

**SENTENCING BRIEF OF TONY YE**
**CASE NO. 19-CR-111-LHK**

HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

sentencing. Their status as non-crime victims in this proceeding is underscored by the fact that neither the Probation Office nor the government has sought restitution here.

The conduct by Mr. Ye alleged by the Bonnel-Rogers clients was neither presented to the grand jury, nor set forth in the charging document, nor described in the plea agreement. Because the conduct and harm alleged by the Bonnel-Rogers clients go well beyond the criminal conduct associated with the crimes of conviction, the Court can have no confidence that their allegations are true. For example, there is no evidence in the record to support the cookie-cuttter allegation in the Bonnel-Rogers "victim impact statements" that "Tony Ye took the BAIFI's $40 million and loaned it to himself." Each of the Bonnel-Rogers clients had the opportunity to contact the FBI during the long course of this investigation and prosecution, after which federal prosecutors would have determined whether probable cause existed to charge any additional crimes. They should not be allowed at the eleventh hour to bombard these proceedings with unsubstantiated claims of further criminal conduct.

For these reasons, attorney Bonnel-Rogers and her clients have no right under the CVRA to be heard at sentencing, or to have their written statements considered by the Court. The Court should not permit them to intercede at this late stage in the proceedings and sidetrack Mr. Ye's sentencing hearing.[5]

---

[5] Remarkably, Bethany Liou has submitted a "victim impact statement" claiming that she too was a victim of (uncharged) crimes committed by Tony Ye. As previously discussed, Bethany Liou diverted investor funds held by her regional center for her own benefit, and ultimately agreed to a SEC cease-and-desist order requiring her to pay back over $49 million. *See supra* footnote 2; PSR ¶ 30. Ms. Liou is not a "crime victim" within the meaning of the CVRA for the same reasons as the Bonnel-Rogers clients: the harm of which she complains was not "directly or proximately" caused by the crimes of conviction. Moreover, she lacks credibility: in her statement she indicates that she lied to the SEC in her "sworn testimony" (but blames Mr. Ye's ex-wife for telling her to do it). She also admits giving Mr. Ye her email password so that he could delete her emails. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

SENTENCING BRIEF OF TONY YE
CASE NO. 19-CR-111-LHK

## VI. OBJECTIONS TO PRESENTENCE REPORT

Mr. Ye wishes to clarify PSR ¶ 79, which appeared for the first time only after the draft PSR was circulated. Mr. Ye did not list his residence as an asset because it does not belong to him. He and his ex-wife originally bought the house for $5.85 million in 2013, with proceeds from the sale of their prior residence plus a $2.5 million mortgage. When the couple divorced in July of 2017, Jean Chen received the house in the settlement. She later conveyed half of it to a trust for the benefit of her daughter. Mr. Ye expects that the house will be sold in the future and that he and his parents will have to find another place to live. In the meantime he is responsible for paying utilities and upkeep.

Their marriage dissolution was filed in San Mateo Superior Court on July 13, 2017. PSR ¶ 65, which states that the couple divorced in 2018, should therefore be corrected.

## VII. CONCLUSION

Mr. Ye led an exemplary life before he made the mistakes that led to his prosecution and conviction in this case. He has learned a hard lesson and will not break the law again.

The interests of justice do not require a term of imprisonment for him. The Court should instead sentence Mr. Ye to a six-month term of home confinement, coupled with 80 hours of community service, consistent with an adjusted Offense Level of 10 and Criminal History I under the Sentencing Guidelines.

DATED: November 10, 2021          **RESPECTFULLY SUBMITTED,**

**HOLMES, TAYLOR, COWAN & JONES LLP**

*/s/Andrew Cowan*
Andrew S. Cowan
Attorneys for Defendant Tony Ye

**HOLMES, TAYLOR, ATHEY, COWAN, MERMELSTEIN & JONES LLP**
811 Wilshire Boulevard, Suite 1460
Los Angeles, California 90017

EXHIBIT 1

November 10, 2021

Hon. Lucy H. Koh
United States District Judge
San Jose Courthouse, Courtroom 8
280 South First Street
San Jose, CA 95113

Dear Judge Koh:

Your honor, please allow me to present this letter to you, not as an argument for less penalty, but truly intend to be a self-reflection of who I am and what I did wrong.

A few weekends ago, my daughter came home from college for the weekend. She took BART. Since I was late to pick her up, I asked her whether she would take Uber. She said she would rather walk the 4 mile home. Concerning it was late in the evening, I asked for the reason. Here is what she told me: about 3 years ago, I was charged with criminal case, for a period of time, I was angry, self-pity, sometimes shouting at her; and when I was emotionally down, I have to asked her to ride Uber home from her high school. In her mind, she associates Uber with all those negative moments in our life. She does not want to be reminded of those time, and rather walk home late in the evening. Regret, remorse? certainly, I wanted to protect my family, my daughter and make my parents proud of me, but for what I did, I failed it all.

I came to study at UC-Berkeley when I was 23. With only $3000 from my parents' saving, I can't afford the tuition and living expenses for universities here. It was UC's teaching and researching assistantship made it possible for me to finish my degree. I have an American dream, like many young immigrants. I wanted to be successful, earn people's respect, make my parents proud of me. I was in science major, and after graduation, I worked over a decade in the industry of environmental risk analysis; starting as an assistant scientist, and eventually became a senior scientist.

1

EXHIBIT 1

In 2009, after many years working in the industry of environmental science, I saw opportunity in real-estate development. At the same time, my wife (now ex-wife) Jean Chen's law office are very busy. I took an open office in her firm, spent part of my time as the office manager. Like myself, Jean Chen is also the first generation immigrant. Both of us worked very hard, and as its peak, her law firm hires more than 20 people, and helped thousands of immigrants for visa applications, about 10% are for investment immigration (called EB-5). Now looking back, eagerness to be successful, flattering from clients, new paper coverage in Chinatown, are catalyst for pride and greed. It laid the route to what happened next.

In 2014, the owner of a mixed-use development project in Fremont contacted us. This project was Golden State Regional Center (GSRC), Bay Area Fund I, known as the Sabercat project. It was already approved as an investment opportunity fund by USCIS. The original owner wanted to sell the Sabercat project, along with GSRC. For investment immigration, the law requires each investor invested $500,000; and all the fund need to apply to job creation activities, such as construction. Failure to generate jobs often result in investors not qualified for immigration. In the EB-5 industry, a lot of projects fail to create jobs.

As a real estate developer, I have a few business acquaintances who has interest in Bay Area development opportunities. I was thinking by helping them develop the Sabercat project, as least I could make sure EB-5 investors' fund are all used in the development/construction to create jobs. It is an advance in my career as a development consultant, and at the same time, boost law office of Jean Chen's reputation and business. So although my friend Kai Robinson is the legal owner of GSRC, I was in control of the bank account for it and its projects. I really wanted the EB-5 investors to receive their approval from USCIS, and I knew my wife was very experienced immigration attorney who could make that happen. I wanted to be involved with the GSRC projects to make sure that they were being managed properly; I also hoped to make some money in the process. But I also knew that the subscription documents did not disclose my involvement in the projects, and I knew USCIS would see that as conflict of interest. Not disclosing my role was wrong and I tried to cover up my wrongful conduct. I made matters even worse when I tried to interfere with SEC investigation by deleting emails of Bethany

EXHIBIT 1

Liou. This happened at the Law office, after my then-wife Jean Chen asked Bethany Liou to meet with her there. Jean asked Bethany Liou to delete certain emails, but I was the one who actually deleted them, after Bethany Liou gave me access to her account for this purpose.

During the time I managed the GSRC accounts, I did not take or use any of the money in them for my personal use, all of the money was spent on the development projects. I was very careful to make sure all of the money got spent on the projects. Somehow I hoped in my heart, that as long as all funds are used to create jobs (I convinced myself it was a bigger good), that the dishonesty with non-disclosure could be forgiven. Now looking back, I was foolish. Wrong is wrong, nothing can remove my wrongful conduct. And I will have to face the consequence. I was hoping to protect Law office of Jean Chen, to protect our reputation, to protect my daughter. But what I did is to the contrary. Over the past three years in this trial, my parents was so worried, my daughter still has the bad memory of Uber. I missed her high school graduation. Most banks closed my accounts.

But, I am also somewhat thankful. For the past three years, I was able to care for my aging parents. At 87 and 84, my parents are no longer able to care for themselves. My dad has sight and hearing problem. Doctor told us the eye and hearing problem is due to his cerebellar dysfunction, also its caused him having difficulty to raise leg, and moving. My mom is 30 years in type II diabetes, needs daily insulin injection. She is resilient and optimistic, but the truth is the diabetes already cause her liver damage – Cirrhosis of liver, she has 2 emergency room visits for internal bleeding in the past 3 years. Both of them do not speak English, I am their interface outside world, I talked with their doctor, pharmacy, take them to medical test, buy grocery and cook most meals. I was considering sending them to a nursing home, but to them, COVID will be devastate, and likely life ending event.

During these most difficult time, Ariel Lu walked into my life. She came from Taiwan, was a pilot flying 747 in Taiwan. I respect her, love her not only because she has the courage and strength to fulfill her dream, also because she is an honest, caring person. She is a single mom, taking care of her 10 year old son (Dennis), and has a full time job in an electrical manufacture company. I love Dennis and I

EXHIBIT 1

believe he loves me. Ariel knows I am facing legal issues. But she told me she saw the good soul inside of me. She encouraged me to be brave, to face the problem and to believe in the future. I am very lucky to have her and Dennis in my life. Ariel and I are engaged, friends asked whether we have a wedding date, we don't yet. I want to marry her as a clean person, give her the best of me. I will finish my sentence, then marry her.

I have been busy with work for most of my adult life. In the past three years, I am thankful to spend time caring for my parents. I am thankful I was able to help my daughter to navigate through high school and enter into college. I am thankful Ariel and Dennis come into my life.

From angry and self-pity, I reflected of my life and guilt. I came to this country with American dream, I received financial support from UC to allow me to finish my education. I always wanted to repay my community through hard working, kind heart and warm smiles. Ending up in this court, and causing court to spend time on me is shameful and is the last thing I ever wanted. It is too late for me to say my ex-wife and I should have been transparent about our role in GSRC. But it is not too late to for me to say that I will never do something like this ever again.

My action caused worries and tears among the people who love me. I failed them. I am so sorry. With all remorse and regrets, I am ready to face the consequence of the judgement. I would like to send my appreciation to the court, to pre-trial officers. I was treated with respect and dignity. I made many mistakes, major ones in my life. But I continue trusting American legal system, and continue believing in American dream.

Your Honor, thank you for spending your time reading this.

Yours Truly,

Jianyun "Tony" Ye

EXHIBIT 1

# EXHIBIT 2

The Honorable Lucy H. Koh
United States District Judge

November 6, 2021

You Honor:

My name is Ai Lu, many also know me as Ariel. I am writing this letter to support my fianceé Jianyun "Tony" Ye. It might appear to be natural that one would write such a letter to support her love ones. But for me, even Tony's friend and attorney are somewhat surprised that I chose this time to get engaged to Tony.

I came to the U.S. from Taiwan, I was a proud commercial airline pilot for Taiwan airlines before I came. I am now a U.S. citizen, a single mom, and working as a Program Manager for a large public traded U.S. electronic manufacture company.

I met Tony 5 years ago when I was working in a telecommunication service company. Tony's company is my client and use our service. I moved in with Tony 2 years ago, knowing him is facing legal issues.

In my mind, Tony is a hardworking and very honest man who works late in his office, a good son who take care of his parents, a caring father who would spend hours waiting at the train station to pick up his daughter. Last year, during COVID, all school buses stop service, everyday Tony picks up Dennis (my son) from school, taking care of him until I get home. Tony and Dennis get along very well, and Tony used his own experience to educate Dennis. One time, Dennis heard the "N" word in school, and Tony told him it is wrong to discriminate any one of skin color or country origination. Tony told Dennis his first language tutor after coming to the U.S. was a black student in U.C. Riverside, and said without him help, it would take him much longer to settle in and to follow classes. He said to Dennis it is how hard a person works to separate him from others, not skin color.

Last year, Dennis wrote in a birthday card to Tony as follow "Dear Tony you have taken good care of me all these days, I really appreciate you and your kindness, you are a very good role model to me once I grow up I will be a

EXHIBIT 2

home divorcer like you, too" – (Dennis doesn't know the word "home developer"!)

You honor, to me, that's the type of person Tony is. I heard of his past, he told me of his regret and wrong things he did. But, I know in my heart, he is not a thief, he would not take other people's money, he wanted to help others, he wanted to protect others.

Tony and I would love to get married. But Tony wants to wait after serving sentence, he wants to marry with me as a clean person. I respect his way and willing to wait for him. There is one thing I observed about his change, 5 years ago he didn't like to go home, he always spent time with his team or friends, taking them out for dinner/ or a drink after work. In the past few years he has changed, he stays home all the time, taking care of parents, his daughter, my son Dennis and spend time with me. I like to think that I helped him learn how to work a little less hard and become a more family oriented person.

You honor, please allow me to be selfish to ask you not letting him go to jail. I am a single working mom, I can't take care of Tony's parents and my 10 years old son alone. We all need him.


Sincerely yours,

Ai "Ariel" Lu

EXHIBIT 2

EXHIBIT 3


Hon. Lucy H. Koh

United States District,

San Jose Courthouse,

280 South First Street,

San Jose, CA 95113


Dear Judges,


   My name is Xizhen Wu. I am writing to you to express my support for Tony Ye. Please forgive me for writing this letter in Chinese as Chinese is my mother tongue and could best express my thoughts.

   I was born in China and am now a permanent resident in the U.S., living in Palo Alto. I came to know Tony over ten years ago when I was applying for investment immigration through Law Office of Jean Chen, and the program I chose was Seattle American Life. My application for immigration went on smoothly, and my son and I have all immigrated to America. Now my son has graduated from university and is working in New York. Seeing my son's growth, I believe that my decision of immigration was correct. Tony has always been eager to help others, and during the time of applying for immigration and when we just landed in the U.S., I would call the law firm for advice in case of any legal or life-related problems. Sometimes no one was available in the law firm, and I would call Tony directly, who would always actively help me find a competent attorney in no time to figure out the solution.

   In 2016, I invested in the Kawana Medeaw project in Santa Rosa under the recommendation of Tony. There were in total three shareholders: Ivy Chenn, Will Oswald and me. The project was entrusted to Will for management, who was trustworthy. He had been a fireman (captain of the fire brigade), and has been working as supervisor of house construction for 20 years after retirement due to injuries. As of last year, we have completed the construction of 38 houses. Due to the big fire in Santa Rosa in recent years, there is an increased demand for affordable houses. Our houses are sold at an average price of USD 450,000. The first 38 suites were sold out in merely three months. The EB5 loan of USD 12.5 million on this project has all been used for the project construction. The total investment of the project exceeded USD 25 million. Although Tony did not manage this project, he would actively give me suggestions from the perspective of a developer if I had any question about the project. I know that Tony loved his work very much, and frequently mentioned that he felt proud of being able to build houses the market demanded for a city, and meanwhile create job opportunities.

   I had few interactions with Tony's family, but Tony often mentioned his daughter, and at the same time had to take care of his elderly parents. On two occasions when I called him, he was accompanying his parents to see a doctor in the hospital.

   In the minds of our mutual friends and me, Tony is an enthusiastic man ready to help others. I am not very clear about the legal case of Tony, but I just hope that when determining the penalty, the court could understand

EXHIBIT 3                                                                 Page 2 of 3



**LIMING PALS**
3114 Whitetail Ln Ames, IA. 50014
T: 641-903-9695 | limingpals@gmail.com | www.ivorytowerintl.com
Member #248637

that Tony is such a hard-working man who is loyal to his family and eager to help others. Your consideration is highly appreciated!


Yours truly,

Xizhen Wu

[Signature]

October 25, 2021

EXHIBIT 3                                              Page 3 of 3

Hon.Lucy H.Koh
United States District,
San JoseCourthouse,
280 South First Street,
San Jose, CA 95113

尊敬的法官，
您好！

  我叫 Xizhen Wu, 我写这封信是为了表示对 Tony Ye 的支持，请原谅我需要用中文写这封信，因为中文是我的母语，最能清楚表达我的想法。

  我出生在中国，我现在是美国永久居民，住在 Palo Alto。我认识 Tony 超过十年了，当时我正在通过 Law office of Jean Chen 申请投资移民，我当时选择的项目是西雅图 American Life。我的移民办得非常顺利，我和我的儿子都移民美国。现在我的儿子已经大学毕业，并且在纽约工作。看到我儿子的成长，我觉得我移民的决定是正确的。Tony 一直非常热心帮助人，在办理移民期间以及我们刚来美国时，凡是遇到法律或生活问题，我都会打电话到律师事务所咨询，有时找不到律师我就打 Tony 的电话，Tony 总是会尽快积极地帮我寻找相关律师找出答案。

  我于 2016 年经 Tony 的介绍投资了位于 Santa Rosa 的 Kawana Medeaw 项目。我们股东一共有三方：Ivy Chenn、Will Oswald 和我。项目是委托 Will 管理，Will 是一个值得信赖的人。他以前是消防队员（队长），受伤退休之后做了 20 年房屋建筑监理工作。截止去年我们已经完成了 38 套住宅的建设。该项目由于近年 Santa Rosa 的大火，对于可负担的房屋的需求大增。我们的房子平均售价 45 万美元。前 38 套仅三个月就销售完了。该项目上有 1250 万美元的 EB5 贷款已经全部用在项目的建设上。项目的总投资超过了 2500 万。虽然 Tony 不管理该项目，但是我有项目的问题，Tony 都从开发商的角度积极地跟我提建议。我知道 Tony 很热爱他的工作，之前也时常提到，能够为一个城市建设市场需要的房屋并同时创造就业机会是他觉得自豪的一件事。

  我和 Tony 的家庭没有什么交往，但是 Tony 嘴边常常提到他女儿，并且同时他还要照顾他年迈的父母。有两次我和他打电话，他都在医院陪父母就诊。

  在我和我们共同的朋友的眼里，Tony 是一个热心愿意帮助别人的人，我对 Tony 的法律案件并不了解，我只是希望法庭在衡量惩罚的时候，了解到我们眼中 Tony 是这样一个忠于家庭，热心助人，努力工作的人，请法庭予以考虑！

Yours Truly,

Xizhen Wu

*Xizhen Wu*
10/25/2021

EXHIBIT 3



Member #248637

## <u>Certification of Translation Accuracy</u>

Translation of **"XIZHEN WU STATEMENT"** from **"CHINESE"** to **"ENGLISH"**:

I, LIMING PALS, an ATA certified translator from Chinese to English, hereby certify that the above-mentioned document(s) has (have) been translated by me. I am an experienced and qualified professional translator and that, in my best judgment, the translated text truly reflects the content, meaning, and style of the original text and constitutes in every respect a correct and true translation of the original document.

This is to certify the correctness of the translation only. I do not guarantee that the original is a genuine document, or that the statements contained in the original document are true. Further, I assume no liability for the way in which the translation is used by the customer or any third party, including end users of the translation.

A copy of the translation is attached to this certification.

Printed Name: LIMING PALS

Dated: November 5, 2021

American Translators Association

Liming Pals
Chinese into English
Certification #497284

Certified Translator

Verify at www.atanet.org/verify

EXHIBIT 3

# EXHIBIT 4

Hon. Lucy H. Koh
United States District Judge
San Jose Courthouse, Courtroom 8
280 South First Street
San Jose, CA 95113

21 October 2021

Dear Judge Koh:

It is my pleasure to submit for your consideration this letter in support of Mr. Tony Ye. I sincerely hope that the following statement will assist the Court in arriving at an appropriate conclusion to this matter. Thank you in advance for this opportunity to introduce myself and to discuss the impact that Mr. Ye has had on my life, as well as my observations about his overwhelmingly positive contribution to the community.

My name is Chadbourne Converse, I am thirty-four years of age and I am a natural-born citizen of the United States. In fall 2010, I graduated from the University of California, at Berkeley, and then attended law school at the University of California, at Davis, King Hall School of Law, graduating in fall 2013. After successfully passing the California Bar Examination, I joined the Silicon Valley firm known as the Law Offices of Jean D. Chen, in June 2014, as a clerk. I continued to work for this firm until December 2019, developing a skillset in contract, immigration and real estate law, obtaining the position of head clerk and becoming leader of the professional research and writing team.

At the time I became an employee, Mr. Tony Ye was working as the office manager at the Law Offices of Jean D. Chen. During that period, Mr. Ye was also conducting his own separate business in the real estate development industry. Recognizing the applicability of the skills I developed in my capacity as a law clerk to the real estate development industry, Mr. Ye invited me to collaborate with him in his separate business. For at least five years, we frequently worked closely together on a wide variety of real estate development projects, an experience that both enriched my life immensely and also yielded great insight into the personality of Mr. Ye, especially his character, motivations and values.

In my experience, Mr. Tony Ye has been not only a personal mentor, but also an exemplar of business ethics and a leader in the Chinese-American community. As I began my own career development, Mr. Ye was a constant

EXHIBIT 4

source of encouragement and support, freely offering his insights and helping guide me to realize my potential. During countless meetings, in small groups or large, Mr. Ye very clearly articulated at every opportunity that he expected his colleagues to conduct themselves with dignity and respect for others. He frequently impressed upon me and my coworkers that business dealings should not be dictated by blind self-interest.

Throughout the time I have known him, Mr. Ye has been a leader in the Chinese-American community and a strong voice for immigrant rights. I can not begin to enumerate the ways in which Mr. Ye has opened my eyes to Chinese culture and helped to articulate the many differences and similarities between the United States and the Far East. By personally evaluating potential EB-5 real estate investments to ensure that they were legitimate and likely to succeed, Mr. Ye assisted countless families in achieving opportunities to participate in the American Dream. Whenever I heard him speak about these matters, Mr. Ye never failed to emphasize that his foremost goal was to work within the parameters of the EB-5 program to direct overseas capital into the damaged United States real estate market, building much-needed housing and creating jobs to stimulate our national economy, while simultaneously facilitating the immigration of qualifying overseas investors. By doing so, he sought to improve the community.

Thank you for this opportunity to submit my statement in support of Mr. Tony Ye. I sincerely hope that you will consider his worthy contributions to our community when arriving at your decision. Please do not hesitate to contact me should you need any further information.

Respectfully,

Chadbourne Converse

EXHIBIT 4